Argued and submitted February 10, affirmed April 26, 1995

In the Matter of the Compensation of
Ronald D. Addis, Claimant.
WINSTON-DILLARD RFPD,
*Petitioner,*

*v.*

Ronald D. ADDIS,
*Respondent.*
(92-14624; CA A84475)
894 P2d 532

Brad G. Garber argued the cause and filed the brief for petitioner.

Robert Wollheim argued the cause for respondent. With him on the brief were Allan Coons, Coons, Cole and Cary and Welch, Bruun, Green & Wollheim.

Before Warren, Presiding Judge, and Edmonds and Armstrong, Judges.

EDMONDS, J.

## EDMONDS, J.

Employer seeks review of the Workers' Compensation Board's order setting aside employer's denial of claimant's myocardial infarction claim. Employer argues the Board erred in ruling that the firefighters' presumption, ORS 656.802(4), applies to the claim.[1] We affirm.

The Board found that claimant, a firefighter, responded to a brush fire on May 26, 1992. After the fire had been controlled and while he was investigating the fire's cause, he began to have symptoms of a heart attack. He was taken to the hospital, where he was diagnosed as having suffered a myocardial infarction. A subsequent angiogram revealed that claimant had cardiovascular disease, and that the disease had caused a 20 percent occlusion or blood clot of a coronary artery, which had led to the infarction. The attending cardiologist testified that claimant's myocardial infarction resulted from the increased blood flow and blood pressure in his arteries caused by the physical and emotional stress of fighting the fire on May 26. According to the physician, claimant's arterial walls had developed a covering of plaque over several years, and when the increased blood flow and pressure coursed through his arterial walls on May 26, the plaque ruptured from the walls causing the occlusion. Employer's medical expert agreed that the covering of plaque on the arterial walls led to the heart attack, but opined that there was *no correlation* between the increase in blood flow and pressure and the infarction, and that the clotting would have occurred regardless of claimant's activities on that day.

---

[1] ORS 656.802 defines "occupational diseases." The legislature has created a presumption, known as the firefighters' presumption, which presumes that certain diseases arise "out of and in the course of employment":

"Death, disability or impairment of health of fire fighters of any political division who have completed five or more years of employment as fire fighters, caused by any disease of the lungs or respiratory tract, hypertension or cardiovascular-renal disease, and *resulting from their employment as fire fighters* is an 'occupational disease.' Any condition or impairment of health arising under this subsection shall be presumed to result from a fire fighter's employment. However, any such fire fighter must have taken a physical examination upon becoming a fire fighter, or subsequently thereto, which failed to reveal any evidence of such condition or impairment of health which preexisted employment. Denial of a claim for any condition or impairment of health arising under this subsection must be on the basis of clear and convincing medical evidence that the cause of the condition or impairment is unrelated to the fire fighter's employment." ORS 656.802(4).

Both physicians testified that the *only* method of detecting claimant's particular level of disease before the infarction was through an angiogram. That procedure requires a catheter to be inserted in the groin and threaded into the heart. Dye is then injected and x-rays taken. The test costs between $5,000 and $6,000 and has a mortality/morbidity rate of three per 1,000. The doctors agreed that such a test is not routinely given to detect cardiovascular disease, and that neither doctor would have recommended its performance on claimant based on the lack of family history of cardiovascular disease and other risk factors associated with cardiovascular disease.

Before the infarction occurred, claimant had never been given an angiogram. He had undergone regular physical examinations, which included a cardiac stress test or stress electrocardiogram (EKG). Each time, the results of the test indicated that respondent did not suffer from advanced cardiovascular disease. The physicians agreed that the stress EKG is the customary test for detecting cardiovascular disease.

Employer argues that because claimant did not receive an angiogram, he failed to meet the predicate under ORS 656.802(4) that "any such fire fighter must have taken a physical examination upon becoming a fire fighter, or subsequently thereto, which failed to reveal any evidence of such condition or impairment of health which preexisted employment." Employer relies on our holding in *SAIF v. Bales*, 107 Or App 198, 810 P2d 1346 (1991), in support of his argument that claimant failed to meet that requirement. It points out that in that case, we said:

> "Our review of the legislative history indicates that the legislature intended as a predicate to the presumption that a physical examination under ORS 656.802[(4)] must be of the type that would reveal any evidence of 'any disease of the lungs or respiratory tract, hypertension or cardiovascular-renal disease' for which a claimant later seeks compensation." 107 Or App at 201-02.

It concludes that because the testimony in this case shows that the disease would not have been revealed by any of the stress tests performed on claimant, the statute is inapplicable to his claim.

In *Bales*, the claimant saw his family doctor for a fever, sore throat, cough and congestion. The doctor listened to his lungs, examined his eyes, ears, nose and throat, took his temperature, and determined that he had an upper respiratory tract infection. Four years later, the claimant complained to his doctor of shortness of breath and the doctor ordered pulmonary function studies, which revealed obstructive lung disease in the claimant. The claimant filed a workers' compensation claim for the lung disease under ORS 656.802(4), and the employer denied it. The Board held that the examination of the claimant in conjunction with his upper respiratory tract infection constituted a physical examination for purposes of the statute. We disagreed, reasoning that the doctor's listening to the claimant's lungs did not constitute an examination of the type contemplated by ORS 656.802(4).

Despite employer's arguments to the contrary, the evidence in *Bales* was significantly different from the evidence in this case. In *Bales*, the examination of the claimant was not to determine whether a disqualifying lung disease under ORS 656.802(4) was present, but to determine whether the claimant was suffering from a viral infection. In the present case, the tests performed on claimant were designed specifically to detect signs of cardiovascular disease. As we pointed out in *Bales*, the kind of physical examination that the legislature contemplated for the purposes of the statute was one that would be "rigid" or "competent" to demonstrate a disqualifying physical condition. 107 Or App at 202 n 3. The legislative committee that was considering the proposed bill heard testimony about the type of examinations that were currently being administered. One witness pointed out that one municipality administered EKGs as a required part of the examination. Minutes, Senate Labor and Industries Committee, March 8, 1981, p 1. In our view of the legislative intent, we can find no indication that the legislature intended that the predicate examination exclude any possibility of a disqualifying condition. Rather, its intent was to require the customary tests that the medical profession would use under the circumstances. There is substantial evidence in this case that those kind of tests were given to claimant and, accordingly, the Board did not err in applying ORS 656.802(4).

Employer's other assignment of error does not require discussion.

Affirmed.